**LEE MIDDLETON ORIGINAL DOLLS, INC., Plaintiff,**

v.

**SEYMOUR MANN, INC., Defendant.**

**No. 01–C–1291.**

United States District Court, E.D. Wisconsin.

Jan. 20, 2004.

David G. Hanson, Daniel E. Kattman, Paul J. Stockhausen, Reinhart Boerner Van Deuren, Milwaukee, WI, for Plaintiff.

James F. Boyle, Boyle Fredrickson Newholm Stein & Gratz, Ronald G. Pezze Jr., Peterson Johnson & Murray, Milwaukee, WI, for Defendant.

## DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and DEFENDANT'S MOTION IN LIMINE

GOODSTEIN, United States Magistrate Judge.

The plaintiff, Lee Middleton Original Dolls, Inc. ("LMOD") commenced this action against the defendant Seymour Mann, Inc. ("Mann") alleging violations of the Copyright Act, the Lanham Act and the Federal Trademark Dilution Act. The parties stipulated to the entry of a preliminary injunction, and the defendant filed a third party complaint against Amwell International Corp. ("Amwell"). Amwell failed to respond to the third party complaint and Mann obtained an entry of default against Amwell. The original and two remaining parties to this litigation have consented in writing to the exercise of jurisdiction by the magistrate judge

The defendant has filed a motion in limine and a motion for summary judgment. Both have been briefed and are ready for resolution. A jury trial in this matter had been scheduled to commence on January 12, 2004, but on December 1, 2003, at the joint request of the parties, and for good cause, the case was continued. The final pretrial conference is now scheduled for July 1, 2004, with the jury trial to commence on July 19, 2004.

### STATEMENT OF FACTS

In support of, and in opposition to, the motion for summary judgment, both parties have submitted their respective proposed findings of fact, as well as taking issue with certain proposed factual findings of their opponent. The court has reviewed the respective submissions and the following constitutes the court's statement of facts for purposes of the motion for summary judgment.

LMOD is a manufacturer and seller of collectible dolls throughout the United States. LMOD was founded by a doll artist, Lee Middleton who sculpted the doll faces, hands and feet, which are made out of vinyl. The plaintiff states that its dolls have gained renown because they have the look and feel of real babies. After Middleton died in 1997, LMOD engaged the services of another doll artist Reva Schick, whose doll face, hands and feet "sculpts," as they are referred to, form the basis of this litigation.

In 1999, LMOD registered nine of Ms. Schick's doll sculpts with the United States Copyright Office. During the consideration of the defendant's motion, the court will discuss the manner and nature of this registration. For now, it is sufficient to note that the nine sculpts, which consisted of a baby face, baby hands and arms and baby feet, were registered as the "Reva Schick Collection #1." In 2000, LMOD used the sculpts in this collection to pro-

duce a limited edition doll called "Bright New World," or "Millennium Angel." The doll was sold only during the year 2000 and it received the DOTY Award.

The defendant Seymour Mann is also a manufacturer and seller of collectible dolls. According to the defendant's chief executive officer, Gideon Oberweger, until recently, Mann primarily sold porcelain, not vinyl dolls. In February, 2001, Mann introduced its "My Special Angel" doll at a New York tradeshow. It is this doll that the plaintiff claims infringes upon the copyrighted sculpts that constitute the "Bright New World" doll. Both dolls are also referred to as angel dolls.

Gideon Oberweger states that he first saw what is now the Mann angel doll at a tradeshow in Hong Kong in October, 2000. He visited a booth of Amwell and spoke with its president, Doris Lee, a person with whom he had done business for a number of years. Lee showed Oberweger the angel doll and represented that it was original. Oberweger indicated that he was interested in purchasing and reselling this doll, which he did. The doll, after being obtained by Mann, was given the name, "My Special Angel" and was introduced at the New York show.

This litigation was commenced on December 26, 2001, and the court will mention additional facts as they are necessary for discussion of the various portions of defendant's motion.

### MOTION IN LIMINE

Prior to addressing the defendant's motion for summary judgment, the court will consider its motion in limine. The resolution of this motion affects the court's consideration of the willful infringement issue contained in the defendant's summary judgment motion.

In this motion, the defendant requests the court to exclude what it characterizes

as "settlement discussions" between the defendant's CEO, Gideon Oberweger and plaintiff's president, Timothy Voss that took place at the San Francisco IDEX show on January 25, 2002. To place matters in context, this occurred nine days after the defendant was served with plaintiff's complaint in this lawsuit. Both plaintiff and defendant had a booth at this trade show. According to the deposition testimony of Mr. Voss, the following exchange took place between he and Oberweger.

"Q: Isn't it true, Mr. Voss, that Mann's president told you that he was shocked that the doll that it was selling was not original?

A: He may have said that.

\*     \*     \*     \*     \*     \*

Q: Did Mr. Oberweger tell you that his company was a reputable company that would not intentionally copy another company's product?

A. He made that statement, and then his next words were, 'when this has happened before' which indicates to me a procedure that's not appropriate, that this could happen more than once.

\*     \*     \*     \*     \*     \*

Q: And on January 25th when Mr. Oberweger approached you, he felt, based upon what you heard and saw, that this could be resolved between two businessman?

A: He hoped it would go away." (Deposition of Timothy Voss, attached to Affidavit of Ronald Pezze).

It is the position of the defendant that the statements by Mr. Oberweger were made as part of an effort between businessmen to compromise the differences between their respective companies. As such, the defendant contends that Oberweger's statements are not admissible for purposes of summary judgment or trial pursuant to Rule 408, Federal Rules of Evidence. In response, the plaintiff contends that the statements were not made during a settlement discussion, nor did they accompany any offer of settlement or compromise. In the alternative, the plaintiff submits that, even if the court were to conclude that Oberweger's statements were made during the course of settlement discussions, they are still admissible as evidence of intent and recklessness. In other words, even if the statements cannot be used for purposes of liability, they can be used by the plaintiff to show that defendant's infringement was willful.

The foundation supporting the defendant's position is that the Oberweger–Voss conversation at the trade show was a settlement discussion. In the opinion of this court, the record does not contain sufficient evidence to support such a conclusion. It seems clear that when Oberweger approached Voss, Oberweger wanted to persuade Voss that the matter of the alleged infringement should be resolved outside of court. While this was Oberweger's stated purpose, there is no evidence of a concomitant intent by Voss. In fact, the deposition testimony shows that Voss rejected the proffer to resolve the matter "businessman-to-businessman."

The underlying purpose of Rule 408 is to encourage litigants to engage in settlement discussions without the fear that what they say will return to haunt them. However, before there can be settlement negotiations, both sides must acknowledge, in some manner, that this is what is transpiring. In other words, one party cannot conduct an ex parte negotiation with the other party. In this case, Oberweger could not make Voss a party to a settlement discussion without the latter's acquiescence. There is nothing in the responses of Voss to Oberweger which would indicate that he was of the belief that he was engaging in settlement discus-

sions. Had Voss given some indication of a willingness to discuss the matter, then the defendant's position would be on a solid foundation.

Viewing the facts from an objective standpoint, i.e. what would a reasonable person have believed, the court's conclusion is similar. At best, a reasonable person in Voss' position would have been given the impression that Oberweger wanted to avoid litigation and was extending an offer to enter into settlement discussions as businessmen. It was an offer that was not accepted.

The defendant is not entitled to the protections provided by Rule 408. Oberweger approached Voss at his own risk; before he said anything that could be used against him, he should have made certain he was well within a Rule 408 setting. As such, the defendant's motion in limine will be denied.

### STATUTORY DAMAGE AWARD

■ The parties agree that if the plaintiff is able to prove infringement, it is entitled to an award of statutory damages for each "work" infringed. The issue raised by the defendant is whether or not more than one work has been infringed, as claimed by the plaintiff. The plaintiff asserts that five separate works have been infringed, i.e. one set of hands, one set of feet and one head. The defendant contends that, if the plaintiff is able to establish infringement, it is limited to one award of statutory damages, i.e. for the doll as a whole.

Commencing an analysis of this issue with the statute, 17 U.S.C. § 504(c)(1) provides that " . . . the copyright owner may elect . . . to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to **any one work**, . . . For purposes of this subsection, **all the parts of a compilation** or derivative work **constitute one work.**" (Emphasis added).

Under the Act, a "compilation" is defined as,

[A] work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. **The term "compilation" includes collective works.**

(Emphasis added). 17 U.S.C. § 101.

According to the documents submitted in support of, and in opposition to, the defendant's motion for summary judgment, the plaintiff, by cover letter dated April 20, 2000, to the Copyright Office, requested that nine works be registered under the name of "Reva Schick Collection # 1." The letter indicated that the "collection" contained the following works, i.e. the hands, feet and head, all of which the plaintiff now contends have been infringed by the defendant's doll. (Exhibit F, Material in Support of Defendant's Motion). On October 21, 2002, the Copyright Office issued its certificate attesting to the fact that the Reva Schick Collection # 1 had been registered as VAu 472–379. (*Id.* at Exhibit G).

Based upon the foregoing, it is the defendant's position that the plaintiff registered the sculpts in question as a collection and, according to the Copyright Act, is limited to one award of statutory damages if infringement is proven. The plaintiff disputes the defendant's characterization and contends that it registered nine works, each of which represents a copyrightable effort by the creator Reva Schick. Plaintiff submits that it neither registered its works as a compilation or a collection. In support, plaintiff points to the registration certificate itself for VAu 472–379 (Exhibit

1, Hanson affidavit). On this form, while the title of the work is as indicated above, space # 6 which refers to "derivative work or compilation" is left blank.

While the record submitted supports the plaintiff's contention that it did not register these works as a "compilation," the registration does refer to them as a "collection," and this is in accordance with the plaintiff's request. Under § 504(c)(1) of the Act, a compilation is treated as one work, and under § 101, a compilation includes collections. The court, however, is not satisfied with the foregoing inferential statutory application to resolve this issue, and neither are the parties. Both refer to several court cases which utilize an economic test as a guide in applying the statute to particular fact situations.

In the case of *Walt Disney Company v. Powell*, 897 F.2d 565 (D.C.Cir.1990), the court utilized a functional test as a guide to determine the number of "works" subject to infringement. The court held that it was not the number of copyrights involved that mattered, but to be a qualifying work under the Act, each separate copyright must have its own "separate economic and copyright" life, regardless of the copyright's artistic value. *Id.* at 569. In *Walt Disney*, the district court found that each of the six copyrights of Mickey and Minnie Mouse were entitled to statutory damages. On appeal, the court, using the above test, reversed stating that while Mickey and Minnie have their respective economic and copyright lives, this concept does not extend to them in varying poses, notwithstanding the fact that each pose had its own copyright.

The defendant relies on the language found in the *Walt Disney* case and argues that if Mickey or Minnie frowning or smiling are not considered separate works, why should the plaintiff's set of hands or feet be considered as such? It is only the doll itself, like either Mickey or Minnie, that should be viewed as one work, subject to copyright infringement. The plaintiff submits that the case of *Costar Group, Inc. v. Loopnet, Inc.*, 164 F.Supp.2d 688 (D.Md.2001) is more on point and sets forth certain factors that apply to the instant situation.

The factors to which the plaintiff is referring actually are found in the case of *Playboy Enters., Inc. v. Sanfilippo*, 1998 WL 207856, 46 U.S.P.Q.2d (BNA) 1350 (1998), and are cited by the *Costar* court as one of the ways in which various courts have attempted to determine independent economic value. In both *Costar* and *Playboy*, the issue was whether or not individual photographs, which appeared in a compilation, should be considered as independent works. Important to the *Playboy* court were factors such as whether each individual photo was subject to a separate licensing agreement, whether each photo represented a singular and copyrightable effort and whether the defendant marketed each photo separately on his web site. *Costar*, 164 F.Supp.2d at 710. As applied to the instant case, LMOD states that Reva Schick sculpts the doll's head and limbs separately and each represents a "singular and copyrightable effort" by Ms. Schick. The plaintiff submits that, in another infringement case it has commenced, the other alleged infringer has just copied the LMOD head, but not the limbs created by Ms. Schick.

While the plaintiff refers to what it believes is favorable language from *Costar*, the court's decision does not favor LMOD's position. Ultimately, the court looked to how the plaintiff had registered its 300 photos. Costar had registered its photos as a compilation, and the court concluded that "it would stretch the bounds of credulity to read the evidence Costar supplies as supporting its claim

that the photographs are registered separately from the compilation." *Id.* at 711.

Parenthetically, reference to the *Playboy* case is not much help to LMOD since the facts are so different. Playboy had obtained copyrights for each of the separate images involved, several thousand. The defendant copied these images, placed them on its website and offered them for sale. Playboy sought statutory damages for each of the images copied. The defendant attempted to argue that since the images were collectively displayed in plaintiff's copyrighted magazines, each magazine constitutes a singular violation, but not each image. The court was not impressed with the defendant's argument and found that each image had its own economic value and was viable on its own.

Finally, the parties cite the case of *Stokes Seeds Limited v. Geo.W. Park Seed Co., Inc.*, 783 F.Supp. 104 (W.D.N.Y.1991). This is another case involving numerous photographs that appear in two reference books. The plaintiff had obtained copyrights for each of the reference books, but not for the individual photographs. Furthermore, the plaintiff did not claim that it ever had reproduced the photos independent of the reference books. The court concluded that the photos constituted a collective work and a compilation. While the plaintiff argued that each photo would be capable of living its own economic life, the court determined that none of the photos, standing alone, had artistic or commercial viability to be defined as a separate work. *Id.* at 107.

Applying the economic life test to the LMOD sculpts, the court is not persuaded that the head or sets of limbs, standing alone, have a viable economic life. Even if they have a separate artistic life, it is only when they are used in the completed work, i.e. the doll, that they have an economic life. Whether an alleged infringer uses the head, hands and feet singularly or in combination, it is only when these parts of the collection are assembled as a whole can they be considered to have a viable economic life. Similar to the books in *Costar* and *Stokes Seeds*, it is the end result, the book and not the individual photos, that constitutes a work under the Act.

LMOD registered these sculpts as a collection. That affirmative choice is consistent with the application of the viable economic life test and the language of the Act. The court concludes that, in this case, if the plaintiff is able to prove infringement, it is entitled to one award of statutory damages. The defendant's motion for summary judgment shall be granted on this issue.

## WILLFUL INFRINGEMENT

◼ A copyright holder who is able to establish infringement has the statutory option of also attempting to establish that the infringement was committed willfully. If the copyright holder sustains his burden of proof on the question of willfulness, the court has the discretion of increasing the statutory award. 17 U.S.C. § 504(c)(2). In its motion for summary judgment, the defendant contends that the plaintiff has failed to produce any evidence upon which a finding of willfulness could be made, and this claim should be dismissed as a matter of law. The defendant submits that since Mann did not know that it was copying the LMOD doll, its conduct cannot be found to be willfull. Mann claims that it innocently produced the doll which it purchased from Amwell, and it had no way to know that the doll may have contained copies of the copyrighted sculpts. In response, the plaintiff submits that there is sufficient evidence in the record to raise an issue for the jury.

In this circuit, a finding of willfulness can be supported "if the infringer knows

that its conduct is an infringement or if the infringer has acted in reckless disregard of the copyright owner's right." *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1020 (7th Cir.1991) (quoting *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1115 (2nd Cir.1986)). The Court goes on to state, "[t]he determination of willfulness, which requires the assessment of the defendant's intent, is an issue of fact." *Id.*

In its brief in opposition to the defendant's motion, the plaintiff concedes that it has no evidence to establish that anyone from Mann actually requested that Amwell copy the LMOD doll. Instead, the plaintiff submits that the professed "reliance" by Mann on Lee's guaranty of originality is not credible. Plaintiff contends that, based on the nature of the business relationship Mann had with Doris Lee of Amwell, and based upon the alleged well known lack of respect for intellectual property rights in China where the doll was produced, Mann should have known that Lee was not the doll's creator who could vouch for its originality. Moreover, the plaintiff submits that a reasonable inference can be drawn from the statement made by Oberweger at the San Francisco tradeshow that Mann is no stranger to trafficking in infringing products. Finally, plaintiff points to an article published in the September, 2001 issue of *Doll World* which featured the defendant's "My Special Angel" doll. In the article, Oberweger praises the company's many doll artists, but never mentions that Doris Lee was the artist who created the featured doll.

In reply, the defendant places a contrasting spin on the article in *Doll World.* The defendant contends that if Oberweger was really aware that "My Special Angel" was infringing, he certainly would not have consented to having it appear on the cover, and in a featured article, in this industry

publication. As to omitting the name of Doris Lee, the defendant points out that Oberweger was not the author of the article and Mann's subsequent investigation has disclosed that the genesis for the article was a promotional piece produced by Mann about the company's product line and not about one doll in particular. In regard to the statement of Oberweger at the tradeshow, this is the subject of the defendant's motion in limine, which has been previously resolved by the court.

The court concludes that the plaintiff has raised a genuine issue of fact on the question of willfulness. As such, summary judgment is inappropriate, and the defendant's motion for summary judgment on this issue will be denied.

### TRADE DRESS CLAIMS UNDER LANHAM ACT

The plaintiff's complaint contains claims under both the Lanham Trademark Act, 15 U.S.C. § 1125(a) and the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c). The defendant first urges that the plaintiff's claims under the Lanham Act be dismissed. The plaintiff, while opposing the defendant's motion, points out that the defendant's motion only seeks to dismiss the plaintiff's trade dress and dilution claims, but the complaint also contains an unfair competition and false designation claim, which also falls under the Lanham Act.

The first challenge that the defendant raises to plaintiff's Lanham Act claims is that they are preempted by the Copyright Act claims. In this regard, the defendant is wrong. The authorities cited by the defendant clearly state that the Copyright Act preempts "state law based causes of action that are equivalent to copyright infringement claims," but fail to make a similar definitive statement in regard to claims brought under the Lanham Act. *Natkin v. Winfrey*, 111 F.Supp.2d

1003, 1013 (N.D.Ill.2000). At best, the case law in this circuit stands for the proposition that, for a Lanham Act claim to be viable, separate and apart from a Copyright Act claim, something more than a simple copyright notice violation, for example, must be alleged. See, *Natkin* at 1013, collecting cases. In other words, the plaintiff must do more than simply "reallege their copyright claims under the guise of the Lanham Act..." *Id.* at 1014. See, also *Costar Group, Inc. v. Loopnet, Inc.*, 164 F.Supp.2d 688, 712 (D.Md.2001), in which the court emphatically states, "[t]hus, the Copyright Act, by its terms, does not preempt plaintiff's Lanham Act claims."

Since the plaintiff's claims are not barred by the defendant's preemption challenge, the court now turns to an analysis of that claim. The Lanham Act, 15 U.S.C. § 1125(a)(1) contains a long list of unfair practices. The plaintiff claims that the presence of the defendant's doll in the marketplace is "likely to cause confusion," and this is one of the unfair practices the Lanham Act was enacted to prevent. 15 U.S.C. § 1125(a)(1)(A). The defendant argues that the plaintiff has failed to meet its burden of proof to show that its doll is subject to protection, because LMOD has not established that there is a likelihood of confusion among consumers.

■ The specific inquiry is whether or not the plaintiff has established that the Reva Schick copyrighted sculpts have achieved a recognizable and distinctive place in the relevant marketplace, i.e. have they taken on a "secondary meaning." If they have, then the possibility of a likelihood of confusion can exist. "... [i]n an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, **only upon a showing of secondary meaning**." *Wal–Mart*

*Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 216, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) (emphasis added). " '[S]econdary meaning' is acquired when 'in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself.' " *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).

■ Factors such as direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying have been utilized by courts as a guide in determining whether or not a product should be accorded a secondary meaning. See, *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.1998). The defendant Mann claims that the plaintiff's claim based on secondary meaning must be dismissed since there is no evidence based on the above factors to support such a claim. To the contrary, the plaintiff LMOD contends that it has produced evidence related to the factors set forth in *Thomas & Betts*. For example, it has produced evidence that it features the Reva Schick sculpts in all of its marketing efforts, such as in its catalogues and at tradeshows; it has produced evidence of trade publications featuring Ms. Schick's work; and it has produced evidence of its sales volume. As noted by the court in *Thomas & Betts*, "[a]dvertising which encourages consumers to identify the claimed trade dress with the particular producer ...is some evidence of secondary meaning." 65 F.3d 654, 662 (7th Cir.1995).

In reply to plaintiff's argument, the defendant submits that the plaintiff has failed to produce any evidence from con-

sumers such as testimony or surveys. The defendant argues that the lack of consumer evidence is particularly damaging in assessing the "likelihood of confusion." The defendant goes on to argue that, even if there is a similarity between the dolls' heads, hands and feet, there has been no showing that any customers have been confused.

After reviewing the materials submitted, the court believes that a close question has been presented. In attempting to ascertain whether or not the Reva Schick sculpts have taken on a secondary meaning and whether or not there is a likelihood of confusion between plaintiff's and defendant's dolls, consumer evidence would be very helpful. How better to gauge the mind of the consumer? However, such evidence is not required and for purposes of summary judgment, the court is persuaded that the Reva Schick sculpts have found a special niche in the world of dolls. As even acknowledged by the defendant, they are high quality, collectible dolls that look and feel like real babies. Further, the plaintiff has demonstrated that its "Bright New World" doll has achieved a certain status within the industry and has received an award. The plaintiff has offered evidence of the amount and manner of its advertising, together with sales volume. The plaintiff has also presented its arguments of intentional copying. Notwithstanding the dearth of consumer evidence, at this stage of the case, the plaintiff has created genuine issues of material fact on the questions of secondary meaning and likelihood of confusions. This Lanham Act claim, together with the unfair competition and false designation claims, should be presented to the jury.

### FEDERAL TRADEMARK DILUTION ACT CLAIM

15 U.S.C. § 1125(c) provides protection to the owner of a "famous mark" that has been diluted. The statutory remedy is an injunction. 15 U.S.C. § 1125(c)(2). At the outset, the defendant argues that since it has already agreed to a preliminary injunction, the plaintiff's dilution claim should be dismissed. However, the statute goes on to provide that if the owner is able to prove willfulness, damages are also a remedy. The issue of willfulness has been previously addressed and since it still remains in play, the defendant's first challenge to the dilution claim is of no moment.

Returning to the statute, § 1125(c)(1) sets out eight non-exclusive factors a court may consider in determining whether a mark is distinctive and famous. As with the issues previously discussed, the defendant contends that the plaintiff has failed to produce sufficient evidence, and the plaintiff disagrees. Again, the plaintiff points to such factors as the distinctive look of the Schick sculpts, the fact that her creations have been recognized in the industry and she has won an award. Basically, the plaintiff argues that this is a jury issue. The court agrees.

There is, however, an issue beyond the determination of whether the mark is famous. The plaintiff cites the recent Supreme Court case of *Moseley v. v. Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003), which raises another issue in regard to the dilution claim. Even proceeding on the basis that whether the plaintiff's mark is "famous" raises a jury question, does the Federal Trademark Dilution Act require proof of actual dilution? In answering this question, the Court states that the text of the statute "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." *Id.* at 123 S.Ct. at 1124. The Court refers to the definitional section of the Act which states that dilution "means the lessening of the capacity of a famous

mark to identify and distinguish goods or services, regardless of the presence or absence of..." competition or likelihood of confusion, mistake or deception. 15 U.S.C. § 1127. In *Moseley,* summary judgment dismissing the dilution claim was affirmed on the basis that the mark's owner failed to present any evidence of the dilution of the famous mark.

In regard to the matter of proof, LMOD notes that the *Moseley* court acknowledged that direct evidence of dilution, such as consumer surveys, may not be necessary "if actual dilution can reliably be proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical." *Id.* at 1125. Plaintiff submits that since the head, hands and feet of both dolls are virtually identical, this constitutes sufficient circumstantial evidence of actual dilution. In other words, the plaintiff interprets *Moseley* to stand for the proposition that where both marks are identical, that in itself is sufficient circumstantial evidence to prove actual dilution.

Not all courts read the above portion of the *Moseley* decision as does the plaintiff. In *Savin Corp. v. Savin Group,* 2003 WL 22451731 (S.D.N.Y.), the court indicated that the foregoing sentence "is not easy to interpret." *Id.* at *14. The *Savin* court rejected LMOD's interpretation and ruled that the fact that plaintiff and defendant's trademarks are identical does not excuse the plaintiff from having to present some evidence of actual dilution. The court interpreted the *Moseley* statement to mean that whatever the difficulties of proof may be, they are not sufficient to excuse establishing an essential element of the statutory violation and simply presenting identical marks will not suffice. *Id.*

The Seventh Circuit recently considered the phrase in question in addressing the issue of dilution. In *Ty, Inc. v. Softbelly's Inc.,* 353 F.3d 528 (7th Cir.2003), the trial court had determined that the plaintiff's mark was famous. However, on appeal the court stated that there was great doubt as to whether the plaintiff had proven dilution since no evidence of any sort was presented which would meet the statutory definition. *Id.* at 534–35. No consumer evidence was presented and, on appeal, the plaintiff referred to the *Moseley* comment. Judge Posner, writing for the majority, stated that the Supreme Court did not explain what the "circumstantial evidence," might be but interpreted *Moseley* to require the need for "trial-type evidence." The case was remanded. *Id.* It should be noted that Judge Posner also found that the two products were not identical, so the court did not directly face the issue as did the *Savin* court.

In view of the developing status of the law on the nature of evidence required, the court believes that the best course is to permit the plaintiff the opportunity to present its dilution claim to the jury. The defendant's motion for summary judgment on this issue will be denied.

### SUBSTANTIAL SIMILARITY

■ As can be seen, many of the challenges raised by the defendant overlap. For example, willfulness applies to more than one of the plaintiff's claims, as does the issue of the likelihood of confusion. The same can be seen for substantial similarity. As previously discussed, whether or not the products are identical affects the nature of the evidence required for proving actual dilution. In addition, the defendant argues that the plaintiff's copyright claim should be dismissed because LMOD cannot show substantial similarity. The defendant submits that, at best, all the plaintiff is able to show is that both the "Bright New World" and the "My Special Angel" dolls are "angel" dolls. That is the extent of any similarity between the two; if they

were not angel dolls, they would not be similar in the least.

The test for substantial similarity,

> ... focuses on the response of the "ordinary observer," and asks "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value."

*Atari Inc. v. North American Philips Consumer Elec. Corp.*, 672 F.2d 607, 614 (7th Cir.1982). This test does not involve "analytic dissection and expert testimony," but turns on whether the accused work has captured the "total concept and feel" of the copyrighted work. *Id.* at 614.

The plaintiff, of course, is of the opinion that the answer to the question of substantial similarity is obvious; in its brief in opposition to the defendant's motion, plaintiff contends that the Mann doll is a "dead-on knockoff of LMOD's copyrighted sculpts."

Both parties invite the court to make a "side-by-side" or "ocular" comparison and then rule, as a matter of law that the dolls are either substantially similar or not. The court declines this joint invitation. If there was ever an issue for a jury of "ordinary observers," this is it. The court will let the jury decide whether or not the defendant has unlawfully appropriated the plaintiff's copyrighted sculpts. The defendant's motion for summary judgment, and the plaintiff's request for judgment in its favor, on this ground will be denied.

Accordingly, the court enters the following order,

**IT IS ORDERED, that**

1. The defendant's motion in limine is **denied.**

2. The defendant's motion for summary judgment is **granted in part, and denied in part**, as follows:

a. The plaintiff shall be able to proceed on its Copyright Act claim, but shall not be able to recover more than one award of statutory damages;

b. The plaintiff shall be able to proceed on its claim of willfulness;

c. The plaintiff shall be able to proceed on its Lanham Act claims; and

d. The plaintiff shall be able to proceed on its Federal Trademark Dilution Act claim.