**S.A.M. ELECTRONICS, INC.,**
**an Illinois corporation,**
**Plaintiffs,**

v.

**Michael OSARAPRASOP, as an individual and doing business as Oshi Global Co., and Poo Fat Ping, as an individual and doing business as Oshi Global Co., jointly and severally, Defendants.**

**Michael Osaraprasop, doing business as Oshi Global Co., Counterclaimant,**

v.

**S.A.M. Electronics, Inc., an Illinois corporation and Jay S. Gilbert, individually, Counterdefendants.**

**No. 96 C 7402.**

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 12, 1999.

Steven Bennett Towbin, Scott E. Becker, D'Ancona & Pflaum, Chicago, IL, Kenneth R. Nowakowski, Kathryn Mary West, Whyte, Hirschboeck & Dudek, Milwaukee, WI, John R. Landis, Chicago, IL, for S.A.M. Electronics, Inc.

James Daniel Dasso, John R Landis, Foley & Lardner, Chicago, IL, for Michael Osaraprasop, Poo Far Ping.

Steven Bennett Towbin, Scott E. Becker, D'Ancona & Pflaum, Chicago, IL, for Jay S. Gilbert.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff S.A.M. Electronics, Inc. ("S.A.M.") filed an amended complaint against defendants Michael Osaraprasop ("Osaraprasop"), as an individual and doing business as OSHI Global Co. ("OSHI") (together, "defendants"), and Poon Fat Ping ("Poon"), as an individual and doing business as OSHI. Plaintiff claims defendants are jointly and severally liable for copyright infringement (Count I), trade dress infringement and federal unfair competition (Count II), common law trademark/trade name infringement (Count III), dilution (Count IV), violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/1 *et seq.*, (Count V), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1 *et seq.*, (Count VI), and breach of contract (Count VII). Plaintiff also demands an accounting (Count VIII). In response, defendants filed second amended counterclaims against S.A.M. and a third party complaint against Jay S. Gilbert ("Gilbert"), as an individual. Defendants allege breach of contract (Count I), breach of the covenant of good faith and fair dealing (Count II), conversion (Count III), and violation of the Illinois Uniform Fraudulent Transfer Act (the "IUFTA"), 740 ILCS § 160/1 *et seq.*, (Count V). Defendants also seek a declaratory judgment (Count IV) and to pierce S.A.M.'s corporate veil (Count VI).

On March 16, 1998, the court denied S.A.M.'s motion to dismiss Counts V and VI of the second amended counterclaims pursuant to Fed.R.Civ.P. 8(a), 9(b), and 12(b)(6). Defendants moved for summary judgment on Counts I–VIII and on Counts I and II of the counterclaims. S.A.M. filed a cross motion for summary judgment. S.A.M. and Gilbert also filed a motion for summary judgment on Counts V and VI of defendants' counterclaims. As discussed below, the parties' cross motions are granted in part and denied in part. S.A.M. and Gilbert's motion on Counts V and VI of defendants' counterclaims is granted.

## FACTS

S.A.M. is an Illinois corporation with its principal place of business in Chicago, Illinois. Gilbert is the president of S.A.M. and owns 100% of its stock. OSHI is a sole proprietorship organized and registered to do business in California. Osaraprasop is the sole owner of OSHI.

OSHI is in the business of designing, importing, distributing, and selling novelty items, including children's toys, pet toys and Halloween items. Since 1989, OSHI has distributed and sold a small children's plastic toy referred to as the Number 89 Frog. The Number 89 Frog is a realistic replica of a frog that is made of plastic and squeaks when it is squeezed. Osaraprasop conceived of and designed the Number 89 Frog using photographs from nature journals and other sources. The OSHI logo is imprinted on the bottom of the Number 89 Frog's hind legs.

OSHI advertises and sells its novelty items by attending trade shows and soliciting orders from distributors. In January 1995, Osaraprasop attended a trade show in Chicago, Illinois. Gilbert purchased a quantity of Number 89 Frogs at that trade show. Shortly thereafter, Gilbert telephoned OSHI's offices in San Francisco, California and asked Osaraprasop whether OSHI was capable of designing, manufacturing, and selling a larger version of the Number 89 Frog with a motion sensor that would activate a "ribbit" sound instead of a squeaking device. Osaraprasop stated that he was capable of designing, manufacturing, and selling such a frog.

Prior to January 1995, Vic's Novelty, Inc. ("Vic's Novelty") manufactured a plastic toy frog with a motion sensor ("the Vic's Frog"). Unlike the Number 89 Frog, the Vic's Frog was not lifelike and resembled a cartoon caricature of a frog. In February 1995, Gilbert shipped four Vic's Frogs to OSHI. Gilbert requested that OSHI manufacture and sell to him a motion sensor frog identical to the Vic's Frogs.

Because it could not use the cartoon-like design of the Vic's Frog, OSHI decided to design and produce a lifelike frog similar to the Number 89 Frog. Osaraprasop then designed an OSHI motion sensor frog. This motion sensor frog is nearly identical to the Number 89 Frog; the only differences in appearance are its increased size and slight variations in the back legs and lower body profile. In designing the OSHI motion sensor frog, Osaraprasop manufactured a two-piece ceramic model. The first piece of the model consisted of the hind legs of the frog. The second piece of the model consisted of the frog's torso, head, and forelegs. Neither Gilbert nor S.A.M. contributed to the design or production of the original two-piece ceramic model. Gilbert then asked OSHI to produce and sell the OSHI motion sensor frog based on the Number 89 Frog.

OSHI and S.A.M. entered into a series of separate contracts pursuant to which OSHI sold and S.A.M. purchased various quantities of the OSHI motion sensor frog. The parties entered into two agreements on February 27, 1996. One agreement read: "OSHI only guarantees product for manufacture defects to expire 30 days after delivery. All other guarantees are will [sic] and void." The other agreement read as follows:

> All frogs and components will be shipped only to S.A.M. Chicago. There will be no diversions to any other destinations, agents, customers, reps, or unauthorized entities. S.A.M. will receive documentation of frogs of OSHI shipments from HK/China. There will be no

infringement on the S.A.M. trademark, advertising, proprietary rights, customers, public relations unless written authorization is issue by S.A.M. Electronics. Product diversion will not take place as of 2/29/96. Violation cancels orders with immediate refund.

The parties also entered into a contract on August 31, 1996, which stated that S.A.M. would make "full payment upon acceptance of keepers at end of inspection (estimated at 7 calendar days)." In addition, the parties executed a number of individual purchase orders.

S.A.M. claims that OSHI infringed on S.A.M.'s copyright of the frogs and of the header cards which accompanied the frogs. The header cards at issue were used to close off the cellophane bags containing the motion sensor frogs. The motion sensor frogs were placed in the bag and the header cards were stapled to the top of the bag. The cards identified the product, the manufacturer, and the selling points of the motion sensor frog.

S.A.M. also claims that defendants breached several of the contracts between S.A.M. and OSHI by sending it nonconforming frogs. S.A.M. cites the testimony of several individuals and companies who purchased frogs from S.A.M. and reported them defective. S.A.M. alleges that it expended a fair amount of money employing people to repair the frogs and render them salable. Defendants claim that S.A.M. breached several of the contracts by refusing to pay for fourteen containers of motion sensor frogs. The parties dispute whether S.A.M. informed defendants of the nonconformities within the thirty days required by one of the February 27 agreements. On November 12, 1996, S.A.M. wrote a letter to defendants alleging that defendants had breached the various contracts and warranties, canceling the contracts, and revoking acceptance of the allegedly nonconforming frogs.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). This standard places on the movant the burden to point to evidence in the record that demonstrates that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the burden then shifts to the non-moving party to set forth specific facts to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(c). "This standard is applied with added rigor in employment discrimination cases where intent and credibility are crucial issues." *Robinson v. PPG Industries, Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994). The court must address all facts in the light most favorable to the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. Cross Motions for Summary Judgment on the Complaint

### A. Count I: Copyright Infringement

S.A.M. brings two claims of copyright infringement in Count I of its complaint. First, S.A.M. alleges that defendants infringed an exclusive copyright in the motion sensor frog by selling the frog to third parties. Second, S.A.M. alleges that defendants infringed S.A.M.'s copyright in the header card used to package the frogs sold by OSHI. Defendants move for summary judgment and S.A.M. cross-moves for summary judgment. Both motions on S.A.M.'s first claim are denied. The motions on S.A.M.'s second claim are denied because genuine issues of material fact concerning access and substantial similarity remain.

#### 1. Motion Sensor Frogs

■ S.A.M. does not dispute OSHI's claims of ownership of the copyright in the motion sensor frog and all the exclusive rights granted by 17 U.S.C. § 106. Rather, S.A.M. appears to claim that OSHI transferred one of its rights as a copyright owner—the exclusive right to distribute the frog in the United States—to S.A.M., and that this exclusive right to distribute was infringed when OSHI sold frogs to third parties in the United States. Under 17 U.S.C. § 204(a), a transfer of copyright ownership other than by operation of law must be in writing and signed by the owner of the rights conveyed or an agent thereof. In addition, the instrument conveying the transfer must demonstrate an intent to transfer the copyright, or an exclusive right encompassed in copyright ownership. *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 413 (7th Cir.1992).

■ The agreement signed by Osaraprasop and Gilbert on February 27, 1996,[1] meets § 204(a) formalities, but does not on its face establish the intent to transfer to S.A.M. one of OSHI's rights under the copyright laws. The contract appears to be some type of distributorship agreement that gives S.A.M. the right to sell the frogs, not an agreement to transfer a copyright. Because the meaning of the term "all frogs" is unclear, and because S.A.M.'s claim must be repleaded as one for breach of contract rather than copyright infringement, the court denies S.A.M.'s and defendants' motions for summary judgment on the issue of whether OSHI transferred its

1. The agreement, recited in the facts section, *supra,* reads as follows: "All frogs and components will be shipped only to S.A.M. Chicago. There will be no diversions to any other destinations, agents, customers, reps, or unauthorized entities. S.A.M. will receive documentation of frogs of OSHI shipments from HK/China. There will be no infringement on the S.A.M. trademark, advertising, proprietary rights, customers, public relations unless written authorization is issue by S.A.M. Electronics. Product diversion will not take place as of 2/29/96. Violation cancels orders with immediate refund."

copyright to S.A.M. and then infringed this copyright by selling frogs to third parties.[2]

## 2. Header Cards

Plaintiff also asserts copyright infringement of the header cards packaged with the motion sensor frogs.[3] Plaintiff claims that OSHI both used S.A.M.'s header cards to ship OSHI frogs to third parties and created its own header card with its own name printed on the card.

■■■ S.A.M. alleges that OSHI infringed S.A.M.'s copyright in its header card by enclosing S.A.M. header cards with sales of OSHI frogs to Universal Tool, Chase and Associates, and Nancy Peterson ("Peterson"). Defendants respond by citing the testimony of Mr. Robert Bailey, who stated that the frogs received by Universal Tool and Chase and Associates were accompanied by yellow S.A.M. header cards when they were purchased from S.A.M. and green OSHI header cards when purchased from OSHI. However, defendants concede that OSHI sent S.A.M. header cards to Nancy Peterson. Although defendants claim that S.A.M. granted OSHI authorization to send the header cards, S.A.M.'s evidence demonstrates that when S.A.M. authorized OSHI to continue selling the frogs, it explicitly forbade OSHI from using S.A.M.'s packaging. Shipping S.A.M. header cards without the authorization to do so constitutes copyright infringement. However, a party seeking money damages on such a claim "must demonstrate that it has been damaged by actual consumer reliance on the misleading statements." *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 206 (7th Cir.1982). Because S.A.M. admits that the sale to Peterson (Gilbert's sister-in-law) caused S.A.M. no damage, the court grants summary judgment for defendants on Count I with respect to the header cards sold to third parties.

■■■ S.A.M. additionally claims that defendants violated S.A.M.'s copyright in its header card through the use of OSHI's own header card. To prove copyright infringement, plaintiff must establish its ownership of the copyright and copying by the defendant. *See Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 613 (7th Cir.1982). At issue here is whether OSHI copied S.A.M.'s header card. This can be established either by providing actual evidence of copying or by circumstantial evidence consisting of access and substantial similarity. *See id.* at 614. The record's lack of evidence regarding actual copying places the basis for S.A.M.'s claims on circumstantial evidence.

■■ Summary judgment is appropriate for the plaintiff "where the works are so overwhelmingly identical that the possibility of independent creation is precluded." *Twentieth Century–Fox Film v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir.1983). For the defendant, summary judgment is appropriate "where works are so dissimilar that a claim of infringement is without merit." *Id.* The court finds that the record does not implicate either standard.

■■ First, S.A.M. has not sufficiently demonstrated that the author of OSHI's header cards had access to S.A.M.'s header card. In proving access, the copyright owner must establish that the author of the allegedly infringing work had an opportunity to view the preexisting work. *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 n. 5 (7th Cir.1994). OSHI's header card was de-

---

2. Defendants additionally claim that S.A.M.'s failure to register the alleged transfer of the exclusive right to distribute the frog precludes the copyright infringement suit under § 501(b). The court notes that S.A.M. has standing to bring suit regardless of whether there is a recordation of transfer of an exclusive right. As evinced by § 205, the recorda-

tion of a transfer merely operates to provide constructive notice of the facts stated in the instrument of transfer.

3. S.A.M. asserts that its header cards were registered on November 11, 1996, and thus may claim copyright infringement.

signed by Richard Nodine ("Nodine"), not Osaraprasop. Further, defendants note that there is no evidence that Nodine had seen S.A.M.'s header card.

S.A.M. avers that the OSHI header cards are so strikingly similar to S.A.M.'s header cards that access can be presumed. *See e.g., Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1169 (7th Cir.1997) ("a similarity that is so close as to be highly unlikely to have been an accident of independent creation is evidence of access"). The court cannot presume access because the similarities between the header cards do not rise to this standard. S.A.M. glancingly addresses the issue of access by pointing to OSHI's ownership of the copyrights for its own header cards and OSHI's agency relationship with Nodine. Although mere affiliation of the author of the allegedly infringing work and the owner of that work does not establish access, OSHI cannot establish that Nodine definitively lacked access. The record contains undisputed evidence that OSHI shipped frogs with the S.A.M. header card to Peterson. Because OSHI had S.A.M. header cards in its possession, Nodine might have had a reasonable opportunity to view these cards. Whether Nodine had access to S.A.M.'s cards in creating OSHI's cards is therefore a question of fact.

The second element required for proof of copying by circumstantial evidence, substantial similarity, is also inappropriate for summary judgment. S.A.M. notes the considerable similarities between the bulleted list of possible uses of the frogs on both the OSHI and S.A.M. header cards.[4] Conversely, defendants note the overall distinctions, such as OSHI's use of different colors, graphics, and slogans in its card. In its response to S.A.M.'s amended claims, OSHI admits that S.A.M.'s header card is copyrightable. Thus, while defendants cannot attack S.A.M.'s copyright in the card itself, defendants are not barred from addressing whether S.A.M.'s copyright extended to the specific phrases OSHI allegedly copied.

S.A.M. alleges that the similarities between the two header cards may result from Nodine's copying of S.A.M.'s preexisting copyrighted work. However, S.A.M. cannot recover for copyright infringement unless the creation of OSHI's header card unlawfully appropriated protectable expression. *See Stillman v. Leo Burnett Company, Inc.,* 720 F.Supp. 1353, 1358 (N.D.Ill.1989). Specifically, the court considers whether the list of possible uses is protectable expression under the copyright act.

■ Short promotional phrases describing a product do not in themselves constitute "any separate value as a composition or as an extension of a work of art." *Alberto–Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705 (7th Cir.1972). Although the defendant in *Alberto–Culver* had paraphrased the language plaintiff used to describe the product, the Seventh Circuit held that a series of merely descriptive short phrases do not possess an "ingenuity and creativity" sufficiently distinct from that "reflected in the product itself." *Id.* at 710–11 (holding that a description of a feminine hygiene spray as "the deodorant of the most personal kind" did not infringe on the copyright of another spray, which described itself as "the most personal sort of deodorant"). In the instant case, S.A.M.'s bullet points listing potential uses have a format and purpose analogous to those of the descriptive phrases in *Alberto–Culver* because both lists serve to promote the product and identify the manufacturer. The court finds that the bulleted list of potential uses on the S.A.M. header

---

4. For example, both cards state that the motion sensor frog can be used as an "Area Security Alarm." Additionally, the OSHI header card states, inter alia, that the product can be used as a "Refrigerator Diet Monitor," "Pet Companion," "Store Entrance Greeter," or a "Desk Security Device," while the preexisting S.A.M. header card states that a motion sensor frog can be used as a "Refrigerator Diet Reminder," "Companion to Your Pet or Dog," "Retail Store Greeting," or a "Deskmate."

card is not protectable expression and cannot provide the basis for a claim of copyright infringement.

While S.A.M. cannot recover damages based only on the alleged copying of the possible uses list, S.A.M. may nonetheless have a claim as to infringement of the header card as a whole. The question of whether the two header cards, as a whole, are substantially similar is best suited for the trier of fact. *See Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir.1977). Although S.A.M.'s claim of copyright infringement may be weaker without a protectable interest in the lists of possible uses, the jury will have to decide whether the cards as a whole are not sufficiently distinct to constitute copyright infringement. The court denies defendants' motion for summary judgment on S.A.M.'s claim that OSHI infringed S.A.M.'s copyright by creating a similar header card.

## B. Counts II and III: Trade Dress Infringement

In Counts II and III of its complaint, S.A.M. alleges that defendants infringed upon its trade dress rights under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and common law. For a claim of trade dress infringement, S.A.M. must show: (1) its trade dress is inherently distinctive or has acquired secondary meaning; and (2) the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.1998) (hereinafter *"Thomas & Betts II "*).

Secondary meaning, also called acquired distinctiveness, is a mental association in consumers' minds between the appearance of the product and the product's source.[5] *See Eldon Industries, Inc. v. Rubbermaid, Inc.*, 735 F.Supp. 786, 815

(N.D.Ill.1990). "Secondary meaning is described as a showing that the primary significance in the minds of the consuming public is not the product but the producer." *Pride Communications Ltd. Partnership v. WCKG, Inc.*, 851 F.Supp. 895, 901 (N.D.Ill.1994).

Secondary meaning can be established through "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Thomas & Betts II,* 138 F.3d at 291. In an effort to prove secondary meaning, S.A.M. states that it has: (1) spent millions of dollars marketing its motion sensor frog; (2) sold millions of motion sensor frogs in the United States; (3) had its frog featured in national trade publications; (4) received media attention in a newspaper from President Clinton selecting its product in a Florida toy store; and (5) marketed the frog as the "Clinton Frog" in response. The court finds this evidence insufficient for purposes of summary judgment.

The most direct form of evidence of secondary meaning is consumer testimony or surveys. S.A.M. has failed to present any such evidence. As for the length and manner of use, S.A.M. sold the Vic's frog for four years. In July 1995, S.A.M. began selling the motion sensor frog designed by OSHI. The motion sensor frog at issue was sold for approximately 14 months before OSHI sold its own motion sensor frog. The fact that S.A.M. sold this new type of frog for little over a year before competition entered the market does not establish conclusively that consumers associated this particular motion sensor frog with S.A.M.

S.A.M.'s assertions of secondary meaning are based largely on advertising. Advertising that encourages consumers to identify the claimed trade dress with the particular producer provides evidence of secondary meaning. *See Thomas & Betts v. Panduit Corp.*, 65 F.3d 654, 662 (7th

5. S.A.M. does not address inherent distinc- tiveness.

Cir.1995) (hereinafter *"Thomas & Betts I"*). However, the advertising must evidence an attempt to identify the product's features with the product's source. "Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding." *Id.* S.A.M. does not provide evidence that suggests that the advertising was anything more than an attempt to promote sales of its motion sensor frog.

The evidence concerning the trade publications and the Clinton article is also insufficient, because it does not identify the circulation of the publications. Although defendants dispute that S.A.M. sold millions of motion sensor frogs and instead claims the number is 640,000, the correct numbers are irrelevant because "evidence of sales, advertising, and use ... is often insufficient to establish secondary meaning." *Spraying Systems Co. v. Delavan, Inc.,* 975 F.2d 387, 393 (7th Cir.1992). The court finds that there is not sufficient evidence to grant summary judgment for defendants on the issue of whether the trade dress used by S.A.M. signifies a source of origin in the minds of the consumers.

The court also finds that the evidence S.A.M. has presented in support of the second prong of the test, whether the defendants' trade dress causes a likelihood of confusion on the part of consumers, militates granting summary judgment for defendants. Courts consider a number of factors in determining likelihood of confusion: "1) the similarity of the trade dresses; 2) the area and manner of concurrent use; 3) the degree of care likely to be used by consumers; 4) the strength of the plaintiff's trade dress; 5) actual confusion; and 6) intent of the defendant to pass off its product as that of the plaintiff." *Thomas & Betts II,* 138 F.3d at 296. S.A.M. has presented strong evidence of actual confusion. Gilbert testified in his deposition that consumers sent defective OSHI frogs

back to S.A.M. for repair and replacement. In addition, S.A.M.'s evidence that OSHI sent Peterson OSHI frogs accompanied by S.A.M. header cards suggests that defendants attempted to pass off an OSHI product as a S.A.M. product. It is irrelevant that Peterson herself may not have been confused by this tactic, because "the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.,* 94 F.3d 376, 382 (7th Cir.1996).

Defendants' attempt at passing off may also indicate that S.A.M.'s trade dress has acquired secondary meaning. *See* 65 F.3d 654, 663 ("[I]f the defendant's intent in copying is to confuse consumers and pass off his product as the plaintiff's ..., the defendant's belief that plaintiff's trade dress has acquired secondary meaning—so that his copying will indeed facilitate his passing off—is some evidence that the trade dress actually has acquired secondary meaning."). The court finds that it does not have enough evidence to determine whether S.A.M.'s trade dress has acquired secondary meaning, and that S.A.M. has presented credible evidence that the similarity of OSHI's trade dress created a likelihood of confusion on the part of consumers. The court therefore denies defendants' motion for summary judgment on Counts II and III, the federal and common law trade dress claims.

 The court also denies defendants' motion with respect to Count IV, S.A.M.'s state law dilution claim. According to Illinois law, the state's Anti–Dilution Act does not apply to competitors. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.,* 1 F.3d 611, 619 (7th Cir.1993).

### C. Counts V, VI, and VIII

 In a footnote to their motion, defendants move for summary judgment on Counts V, VI, and VIII. "Claims for unfair

competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *Spex, Inc. v. Joy of Spex, Inc.*, 847 F.Supp. 567, 579 (N.D.Ill.1994) (dismissing claims brought under the Illinois Deceptive Trade Practices Act and The Illinois Consumer Fraud and Deceptive Business Practices Act) (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983)); *see also Trendmasters, Inc. v. Walgreen Co.*, 1997 WL 208423, *4 (N.D.Ill. Apr.22, 1997) ("Absent protectable federal trade dress, Illinois Consumer Fraud and Deceptive Trade Practices Act and Uniform Deceptive Trade Practices Act claims must also fail."). Because the court cannot resolve the Lanham Act claim on summary judgment, defendants' motion for summary judgment on Counts V and VI is denied. The court also denies defendants' motion for summary judgment with respect to Count VIII, the demand for an accounting.

## D. Complaint Count VII; Counterclaim Count I: Breach of Contract and Warranty

In Count VII, S.A.M. claims that defendants' conduct amounts to breach of contract and breach of warranties. In Count I of their amended counterclaims, defendants allege breach of contract. They seek to recover for the 14 containers of frogs S.A.M. received but refused to pay for, and for an additional 16 containers of frogs S.A.M. ordered but defendants never sent (defendants explain that they withheld delivery when S.A.M. refused to pay for the 14 containers). The parties agree that because the motion sensor frogs are goods, Illinois' version of the Uniform Commercial Code ("the Code"), 810 ILCS § 5/2–101 *et seq.*, governs the sales in the present case. Defendants allege that S.A.M. accepted the frogs under § 5/2–606 and bring an action to recover the price of the frogs under § 5/2–709. Defendants move for summary judgment on their own breach of contract claim and on S.A.M.'s breach of contract and breach of warranty claims. S.A.M. argues that disputed facts prevent the court from granting summary judgment in defendants' favor.

### 1. Breach of Contract

#### a. The Fourteen Containers

 Defendants argue that by reselling frogs from the 14 containers to consumers, S.A.M. "accepted" the frogs it had received and became obliged to pay for them. The court finds that by reselling frogs from the 14 containers, S.A.M. accepted them as "keepers" under the contract. Section 5/2–607(1) of the Code states that "the buyer must pay at the contract rate for any goods accepted by it." Under § 5/2–606(1), "Acceptance of goods occurs when the buyer ... (b) fails to make an effective rejection; or (c) does any act inconsistent with the seller's ownership." State and Federal courts hold that under Illinois law, resale of goods is "an act inconsistent with the seller's ownership." Therefore, even if S.A.M. rejected the allegedly defective frogs in a timely manner, its subsequent sale of the frogs negated this rejection and amounted to an acceptance. *See Dur–O–Wal, Inc. v. Alfa Installations Corp.*, 1989 WL 103361, *2 (N.D.Ill. Aug.25, 1989) (selling of masonry wall reinforcement material was inconsistent with seller's ownership and constituted acceptance of goods); *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F.Supp. 432, 433 (N.D.Ill. 1983) (selling half of an order of shoes to customers amounted to acceptance of the shoes); *Ozite Corp. v. F.C. Clothier & Sons Corp.*, 130 Ill.App.2d 716, 718, 264 N.E.2d 833, 834–35 (1970) (giving notice of rejection of carpet padding and subsequently selling part of said padding amounted to acceptance).

"[E]ven if it is assumed [S.A.M.] did promptly notify [OSHI] the [frogs] were nonconforming, [S.A.M.'s] later actions, (1) were inconsistent with its rejection of the goods, and (2) constituted legal acceptance of those goods." *Banfi*, 568 F.Supp. at

433. Although S.A.M. did not resell all of the frogs, resale of even part of a commercial unit renders a buyer liable for the entire unit. *See Sherwin–Williams Co. v. Mark Charcoal Co.,* 1985 WL 3932, *3–5 (N.D.Ill. Nov.15, 1985) (holding that selling 90% and retaining 10% of a shipment renders the buyer liable for the entire shipment) ("*Sherwin–Williams* may seek summary judgment as to all the cans delivered, not merely the cans that have been resold to Mark's customers"); *Banfi,* 568 F.Supp. at 433 n. 7 (holding that selling 50% of the delivered goods renders the buyer liable for all of the goods delivered).

■ S.A.M. argues that the contract contained an exclusivity provision that prevented OSHI from selling any frogs to third parties. S.A.M. argues that OSHI violated this exclusivity agreement and sent nonconforming goods, and that these violations entitled it to withhold payment to off-set damages. See § 5/2–717 ("The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."). S.A.M. argues that it incurred expenses in attempting to repair the non-conforming frogs. However, because the remedy of "set-off" under § 5/2–717 is restricted to the same contract, "the price of the goods a buyer accepts pursuant to a purchase order is not susceptible to set-off against damages the buyer sustains as a result of a seller's alleged breach of a related distributorship agreement." *To–Am Equipment Co. v. Mitsubishi Caterpillar Forklift America,* 913 F.Supp. 1148, 1155 (N.D.Ill. 1995).

✓ ■ Under Illinois law, distributorship agreements and the purchase orders arising under them are different contracts when "the price, type, and quantity of goods sold resulted from accepted purchase orders and not from the distributorship agreement." *Schieffelin & Co. v. Valley Liquors, Inc.,* 823 F.2d 1064, 1067 (7th Cir.1987); *To–Am Equipment,* 913 F.Supp. at 1155. S.A.M. therefore was not entitled to withhold payment for fourteen of the containers ordered in various individual sales contracts (such as Purchase Order 3147, in which S.A.M. ordered contested containers 27A, 27B, 28A, and 28B, and Purchase Order 3172, in which S.A.M. ordered contested containers 29A, 29B, 29C, 30A, 30C, and 30D) by claiming that defendants breached the February 7, 1996, contract.[6] In addition, "Illinois, as a matter of procedure, requires a defendant's claim in the nature of set-off or recoupment to be pleaded as a counterclaim...." *Schieffelin,* 823 F.2d at 1068 (citing § 5/2–608(a)). S.A.M. did not plead § 5/2–717 as a counterclaim (or, in the context of this case, as an affirmative defense to the counterclaim) as required by Illinois law. The court finds as a matter of law that S.A.M. breached the contract under § 5/2–606 and grants defendants' motion for summary judgment on Count I of its counterclaims.

■ The court does not grant defendants' motion for summary judgment on S.A.M.'s breach of contract claim, however. Once a buyer has accepted defective goods, he may bring an action for nonconformity under § 5/2–607.[7] *See Quaker Alloy Casting Co. v. Gulfco Industries, Inc.,* 686 F.Supp. 1319, 1335 (N.D.Ill.1988). "[W]hen the tender accepted was non-conforming and the buyer has given the seller notice of breach ... *acceptance leaves unimpaired the buyer's right to be made whole,* and that right can be exercised by

---

**6.** Whether defendants breached the February 27, 1996, contract by not selling exclusively to S.A.M. or by sending S.A.M. nonconforming goods, § 2–717 does not protect S.A.M. from liability for breach of contract. Although S.A.M. argues that the court should find that the provisions of the February 27, 1996, contract should be applied to each purchase order, the Seventh Circuit's holding in *Schieffelin* dictates otherwise.

**7.** The court assumes that this is one of the grounds on which S.A.M. bases its general breach of contract claim.

the buyer not only by way of cross-claim for damages, but also by way of recoupment in diminution or extinction of the price." § 5/2–607, note 6 (emphasis added); *see also Dur–O–Wal,* 1989 WL 103361, at *3 (holding that the buyer's subsequent resale of goods amounted to acceptance under § 5/2–606(1) but did not prevent the buyer from cross-claiming under § 5/2–607).

 Disputed issues of fact prevent the court from granting summary judgment on S.A.M.'s breach of contract claim. Under § 5/2–607(2), "Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a non-conformity cannot be revoked because of it *unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured."* (Emphasis added.) The contract required S.A.M. to notify defendants of any defects within 30 days of delivery. S.A.M.'s acceptance may have been conditioned on the reasonable assumption that defendants would cure the allegedly defective frogs. The parties dispute whether S.A.M. gave defendants notice that the first eleven containers contained defective frogs. *See* § 5/2–607(3)(a) ("where tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy").

S.A.M. argues that Gilbert contacted Osaraprasop weekly during July, August, September, and October of 1996, informing him that the frogs were defective. S.A.M. also claims that Gilbert notified Osaraprasop that S.A.M. intended to deduct the damages caused by these defects from the purchase price of the fourteen containers. However, defendants claim that Gilbert did not complain once to Osaraprasop of

the alleged defects between August 31, 1996 and November 12, 1996. If S.A.M. properly notified defendants, it may have accepted the frogs under the assumption that the defects would be cured. The parties' conflicting evidence creates a genuine issue of material fact under § 5/2–607(2) and § 5/2–607(3) about whether S.A.M. notified defendants within seven days of receipt that many of the frogs in the first eleven containers were defective.[8] The court denies defendants' motion for summary judgment on S.A.M.'s breach of contract claim with respect to eleven of the fourteen containers and grants summary judgment for S.A.M. with respect to the final three containers.

The court notes that the existence of S.A.M.'s breach of contract claim does not bar summary judgment in favor of defendants on their breach of contract claim. Other district courts in this circuit have granted summary judgment in nearly identical situations. *See Sherwin–Williams,* 1985 WL 3932, at *5–6. In *Banfi,* the court granted summary judgment for the seller because the buyer had not properly rejected the goods, even though the buyer's counterclaim that the goods were defective was still pending. *See Banfi,* 568 F.Supp. at 433–34; *see also Banfi di Banfi Renzo & Co. v. David Congress Shops, Inc.,* No. 82 C 7554 slip op. (N.D.Ill. Sept.2, 1983) ("What the order decided was that even if the claimed defects existed (so that the goods were non-conforming) [the buyer] had not properly rejected the goods. Thus the issues necessary to be decided in adjudicating [the buyer's] counterclaim are not at all implicated....."). If S.A.M. is successful in its breach of contract claim against defendants, it will be entitled to a remedy. The court therefore declines to enter a final enforceable judgment on defendants' claim. Fed.R.Civ.P. 52(a).

---

8. There is no dispute that S.A.M. gave defendants sufficient notice of any defective frogs in the final three containers mailed (containers 30A, 30C, and 30D). The parties agree that S.A.M. received these containers around November 6, 1996, and that Gilbert mailed a letter complaining of defects on November 12, 1996, thereby easily complying with the contract's 30 day requirement.

### b. The Five Containers[9]

 The court grants defendants' motion for summary judgment with respect to the five of the sixteen containers that defendants refused to ship. Because the court finds that S.A.M. failed to make a payment due, defendants properly withheld their shipment of the remaining five containers. *See* § 5/2–705 ("The seller . . . may stop delivery of . . . shipments of express or freight when the buyer repudiates or fails to make a payment due before delivery or if for any other reason the seller has a right to withhold or reclaim the goods."). However, defendants may not recover for the purchase price under § 5/2–709, because they do not argue or present any evidence that they attempted to mitigate their damages by reselling the frogs. *See* § 5/2–709(1)(b) ("When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price . . . of goods identified to the contract *if the seller is unable after reasonable effort to resell them at a reasonable price* or the circumstances reasonably indicate that such effort will be unavailing.") (emphasis added). Defendants may recover for incidental damages, which include "any comercially reasonable charges, expenses, or commissions incurred in stopping delivery, [and] in the transportation, care and custody of goods after the buyer's breach." § 5/2–710.

### 2. Breach of Warranty

 Defendants move for summary judgment on S.A.M.'s breach of warranty claim. The express warranty provision in the parties' contract reads as follows: "OSHI only guarantees product for manufacture defects to expire 30 days after delivery. All other guarantees are will & void." The express warranty in the present contract required S.A.M. to notify defendants' of any defects within thirty days of delivery. Whether Gilbert properly notified Osaraprasop of defects between September 1996 and November 1996 is a disputed issue of fact. The court denies defendants' motion for summary judgment on S.A.M.'s breach of express warranty claim.

 Defendants claim that the second sentence of the contract's warranty provision deprives S.A.M. of an implied warranty. Implied warranties arise as a matter of law. *See Wheeler v. Sunbelt Tool Co.*, 181 Ill.App.3d 1088, 1101, 130 Ill.Dec. 863, 537 N.E.2d 1332, 1341 (1989). "[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous. . . ." § 5/2–316. The present contract does not use the word merchantability and does not conspicuously disclaim the implied warranty.

 The court finds that defendants breached the implied warranty of merchantability. "Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used." § 5/2–314(2)(c). "In an action based upon breach of implied warranty under section 2–314 of the UCC it is necessary to show the existence of the warranty, its breach, and proximate cause." *Wheeler*, 130 Ill.Dec. 863, 537 N.E.2d at 1341 (citing § 5/2–314, comment 13). To be fit for its ordinary purpose, a motion sensor frog must sense movement and make a sound when it senses such movement. S.A.M. presents evidence that many of the frogs it received did not function correctly or did not function at all, and that it had to hire extra employees to put the frogs in working order. In addition, S.A.M. presents evidence that various purchasers reported that a percentage of the frogs they ordered from S.A.M. did not function correctly or did not function at all. Specifically, Cotter & Co. member stores

---

**9.** Defendants admit that the court can decide their summary judgment motion only with respect to five of the sixteen containers they contend that they refused to deliver, because S.A.M. disputes whether it ordered eleven of these containers.

reported nonfunctioning frogs; Keith Weeks ("Weeks") returned approximately 700 cartons of frogs because some of the frogs did not work at all, while some would not stop croaking. Weeks reported that the replacement shipment also contained frogs that did not croak at all or did not croak at the designated distance. And Marion Preston reported that, after testing the frogs, she found only 24 "good" frogs in a shipment of 200 to 300. Defendants admit this evidence and do not present any evidence that they did not proximately cause the frogs' nonconformities. The court denies defendants' motion for summary judgment on S.A.M.'s breach of implied warranty claim and grants summary judgment for S.A.M. on this claim.

### E. Default Judgment Against Poon Fat Ping

■ S.A.M. moves for the court to enter a default judgment against Poon Fat Ping ("Poon"). S.A.M. claims that Poon was named in the amended complaint filed on February 3, 1997, and was served with the complaint on June 24, 1997. Plaintiff presents no evidence of service. Although summons was issued to Poon on April 15, 1997, there is no return of summons or proof of service dated June 24, 1997 or otherwise. Defendants argue that Poon insists that he was not served. In a letter to defendants' counsel, Poon states that he "received a copy" of the complaint in February 1997. He states that he did not receive a copy of the complaint on June 24, 1997. He also states that the amended complaint lists a different name, that of "Poo Far Ping." It is unclear from this evidence whether Poon was ever actually given proper service of process. The court denies S.A.M.'s motion for a default judgment against Poon.

### II. Motion for Summary Judgment on Counts V and VI of Counterclaims

■ S.A.M. and Gilbert move for summary judgment on Counts V and VI of defendants' second amended counterclaims. In Count V, Defendants allege that certain transfers from S.A.M. to Gilbert amounted to fraudulent transfers in violation of the Illinois Uniform Fraudulent Transfer Act ("IUFTA"), 740 ILCS § 160/5. In Count VI, Defendants argue that these allegedly fraudulent transfers enable it to pierce S.A.M.'s corporate veil and impose personal liability on Gilbert.

Defendants claim that Gilbert has made numerous fraudulent cash disbursements to himself from S.A.M.'s checking accounts for no or inadequate consideration. Defendants also claim that S.A.M. failed to observe corporate formalities in that it did not conduct regular Board of Directors meetings or keep records of any such meetings. Accordingly, defendants assert that S.A.M. is a mere facade for the business operations of Gilbert.

Defendants insist that Gilbert obtained $385,269.68 from S.A.M. that he had not reimbursed by the end of 1997, and that he repaid S.A.M. only $85,000 during 1998, bringing the total Gilbert owes to S.A.M. to $300,269.68. Defendants base this argument on the fact that certain checks (the "disputed checks") which Gilbert claims to have deposited to S.A.M.'s accounts were not endorsed with a S.A.M. Electronics stamp and therefore were not transfers from Gilbert to S.A.M.[10] Gilbert and S.A.M. argue that the transfers were repayments of loans that Gilbert had made to S.A.M. They insist that the disputed checks were stamped by banks where S.A.M. has accounts and were deposited to S.A.M.'s accounts. To support this assertion, Gilbert and S.A.M. rely on Gilbert's testimony in his initial and supplemental affidavits that the disputed checks were

---

**10.** The dates and amounts of the disputed checks were as follows: (1) On March 11, 1996, a check for $25,000; (2) on May 6, 1996, a check for $11,901.34; (3) on April 16, 1997, a check for $83,000; (4) On April 18, 1997, a check for $99,000; and (5) on June 2, 1997, a check for $60,000. Therefore, the total amount in dispute is $278,901.34.

transferred into S.A.M.'s accounts and on the notations on the back of each check that indicate the name of the bank and the account number of the S.A.M. bank account into which the check was deposited. If Gilbert and S.A.M. are correct that the disputed checks were transferred from Gilbert to S.A.M., Gilbert only owed S.A.M. $21,368.34 at the end of 1998.[11]

The IUFTA recognizes two types of fraud, fraud in fact and fraud in law. *See In re Spatz*, 222 B.R. 157, 163 (Bkrtcy. N.D.Ill.1998). The court determined in its opinion on S.A.M.'s motion to dismiss that defendants cannot raise fraud in fact because defendants have offered no evidence that S.A.M. transferred money to Gilbert with actual intent to defraud OSHI.

Fraud in law occurs when, "(1) a voluntary gift is made, (2) there is an existing or contemplated indebtedness against the debtor, and (3) the debtor has failed to retain sufficient property to pay the indebtedness." *In re Martin*, 145 B.R. 933, 946 (Bkrtcy.N.D.Ill.1992). Defendants' uncontested assertion that at the time of the transfers from S.A.M. to Gilbert, S.A.M. had contracted to purchase frogs from OSHI and had failed to pay OSHI the money it owed proves element two. Defendants prove element three with their undisputed statement that at the end of 1996 and 1997, S.A.M. had negative equity in its accounts.

Thus, the only element the parties contest is element one. A transfer is deemed voluntary if the transferor receives little or no consideration. *See Anderson v. Ferris*, 128 Ill.App.3d 149, 153, 83 Ill.Dec. 392, 470 N.E.2d 518, 521 (1984); *see also Tcherepnin v. Franz*, 475

F.Supp. 92, 97 (N.D.Ill.1979). "[T]he drafters made full consideration an absolute defense to fraud in law by requiring the plaintiff to prove that 'the debtor made the transfer or incurred the obligation . . . without receiving reasonably equivalent value' under § 5(a)(2)." *Spatz*, 222 B.R. at 168. " 'Reasonable equivalence' requires a comparison of the value of what went out with the value of what was received." *Grabill Corp. v. Steinberg*, 121 B.R. 983, 994 (Bkrtcy.N.D.Ill.1990). The nearly identical requirement in the Bankruptcy Code has been explained as follows[12]: "[I]f the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain. By the same token, however, if the benefit of the transaction to the debtor does not substantially offset its cost to him, then his creditors have suffered, and . . . the transaction was not supported by 'fair' consideration." *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir.1981). Defendants, S.A.M.'s creditors, have no cause to complain, because S.A.M. received substantially equivalent value for the money it loaned Gilbert.[13] The $ 21,368.34 difference does not change the court's decision that S.A.M. received reasonably equivalent value for its loans, because Gilbert received only $10,000 a year in salary from S.A.M. Because Gilbert and S.A.M. have shown that the transfer was made for reasonably equivalent value, the court grants summary judgment in their favor on Count V of defendants' counterclaims.

In Count VI of the amended counterclaims, defendants attempt to pierce the

---

11. If Gilbert has deposited the disputed checks into S.A.M.'s accounts, this amount must be subtracted from the amount defendants claim Gilbert owed S.A.M. at the end of 1998. Subtracting 278,901.34 from $300,269.68 reveals that at the end of 1998, Gilbert owed S.A.M. $21,368.34.

12. Findings made under § 548 of the Bankruptcy Code are applicable to actions brought under § 5 of the IUFTA. *See Spatz*, 222 B.R. at 163.

13. The Seventh Circuit has held that insiders' loans to a corporation are valid debts of the corporation. *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir.1997).

corporate veil and impose personal liability on Gilbert. To pierce the veil, defendants must show that: (1) S.A.M. is Gilbert's alter-ego; and (2) failing to pierce the veil would sanction a fraud or injustice. *See Hills of Palos Condominium Ass'n, Inc. v. I–Del, Inc.,* 255 Ill.App.3d 448, 479, 193 Ill.Dec. 760, 626 N.E.2d 1311, 1333 (1993). Because defendants cannot show that Gilbert committed fraudulent transfers, defendants cannot prove the "fraud or injustice" element of the claim. The court therefore grants summary judgment in plaintiffs' favor on Count VI of defendants' counterclaims.

## CONCLUSION

The parties' cross motions for summary judgment are granted in part and denied in part. The court grants defendants' motion on Count I in part. The court finds that defendants did not infringe on SAM's copyright in its header cards with respect to the header cards sold to third parties. In addition, the court grants defendants' motion on Count I of its counterclaims and its motion on S.A.M.'s Count VII breach of contract claim with respect to five of the sixteen containers that defendants refused to ship. The court denies S.A.M.'s motion for a default judgment against Poon.

The court grants summary judgment for S.A.M. on its breach of contract claim with respect to the final three containers only, and on S.A.M.'s Count VII breach of implied warranty claim. The court grants summary judgment for S.A.M. and Gilbert on Counts V and VI of defendants' amended counterclaims.

Several issues remain for trail. With respect to Count I, the court denies summary judgment on S.A.M.'s claim that OSHI transferred to S.A.M. one of its bundle of rights as a copyright owner, the exclusive right to distribute the frog in the United States. The court also denies sum-

mary judgment on S.A.M.'s claim that defendants infringed S.A.M.'s copyright by creating a similar header card. The court denies summary judgment on Counts II, III, IV, V, VI, and VIII. The court denies summary judgment on S.A.M.'s Count VII breach of contract claim with respect to eleven of the fourteen containers allegedly containing defective frogs and on S.A.M.'s Count VII breach of express warranty claim.